# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

|  |  |
|---|---|
| DISABILITY RIGHTS MISSISSIPPI, ) | |
| ) | |
| Plaintiff, ) | Case No. 4:09 cv/37 TSL - LRA |
| ) | |
| v. ) | |
| ) | |
| LAUDERDALE COUNTY, MISSISSIPPI, ) | |
| ) | |
| Defendant. ) | |

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
OCT 15 2009
J. T. NOBLIN, CLERK
BY_____ DEPUTY

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### I. Introduction

The Plaintiff in this action has been unlawfully denied access to vulnerable children it has a legal mandate to protect. Federal law requires that Plaintiff Disability Rights Mississippi ("DRMS") enforce the rights of people with disabilities throughout the state of Mississippi— including, but not limited to, children with disabilities who are detained in juvenile detention centers. Federal law specifically empowers DRMS with the authority to conduct confidential visits with residents of any facility that houses people with disabilities, examine relevant records, and perform inspections of the facility. In the wake of reports that the detention facility at the Lauderdale County Juvenile Detention Center ("Juvenile Detention Center") subjects children with disabilities to unlawful abuse and neglect—DRMS made numerous requests to exercise its access authority in the Juvenile Detention Center by contacting Lauderdale County officials and agents, to attempt to work collaboratively with the County and other juvenile justice stakeholders to

ensure that children detained at the Juvenile Detention Center are free from abuse and neglect. Despite DRMS's unambiguous access authority Lauderdale County officials have barred DRMS from exercising this authority at the Juvenile Detention Center. DRMS is therefore required to seek relief from this Honorable Court, and submits the following Memorandum in Support of its Motion for Preliminary Injunction, which seeks to compel the County to comply with the P & A Acts by allowing DRMS to monitor the detention facility at the Lauderdale County Juvenile Detention Center, and to fully investigate allegations of abuse and neglect.

Because the Plaintiff easily meets the standard for issuance of preliminary injunctive relief, this Court should grant the Plaintiff's motion.

## II. Statement of Facts

This case arises out of DRMS's efforts to fulfill its mandates under the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. §§ 10801 *et seq.*, the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"), 42 U.S.C. §§ 15001 *et seq.*, and the Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C. §§ 794e *et seq.* (collectively, "The P & A Acts"). The P & A Acts "provides funding for the states to establish independent organizations…that monitor and protect the rights of the mentally ill." *Advocacy Ctr. v. Stadler,* 128 F.Supp.2d 358, 360 (M.D. LA 1991) (citing 42 U.S.C. § 10803). These organizations are intended to pursue legal, administrative, and other appropriate remedies to advocate for, and to ensure the protection of, people with disabilities and to investigate the abuse and neglect of such persons if there is probable cause to believe that the incidents occurred. 42 U.S.C. § 6042(a)(2)). DRMS is the federally-mandated and funded P & A system in Mississippi. (DRMS recently changed its name from Mississippi Protection and Advocacy Services, Inc. to Disability Rights Mississippi). Compl. ¶ 12. *See Mississippi Protection & Advocacy v. Cotten*, 929 F.2d 1054, 1055-56 (5th Cir. 1991).

Pursuant to its federal authority, DRMS regularly monitors juvenile justice facilities around the state of Mississippi, including the juvenile detention center in Harrison County, Mississippi, where it conducts monitoring visits pursuant to a Federal Court Order that was requested jointly by Harrison County and DRMS, and Hinds County where it conducts regular monitoring under the P & A Acts.[1] Compl. ¶ 5. *See* Exhibit 4 (Agreed Access Order).

Defendant Lauderdale County is the governmental entity with the responsibility to "establish and maintain detention facilities, shelter facilities...or any other facility necessary to carry on the work of the youth court." Miss. Code Ann. § 43-21-109. Thus, Lauderdale County is the entity with the ultimate responsibility to protect and secure the rights of children detained in the Juvenile Detention Center. Compl. ¶ 6.

The Juvenile Detention Center is a 30-bed facility located in Meridian, Mississippi. Compl. ¶ 7. Although the majority of children housed at this facility are awaiting their court appearances, state law allows juvenile detention centers to house children for 90 days as a post-adjudication disposition. Miss. Code Ann. § 43-21-605(1)(k). A significant number of the youths who are detained at the Juvenile Detention Center live with disabilities—including

---

[1] Through its contractor, the Mississippi Youth Justice Project (MYJP), DRMS conducts regular monitoring of the Henley-Young Juvenile Justice Center (HYJJC), the Harrison County Juvenile Detention Center (HCJDC), the Oakley Training School (OTS), and the Walnut Grove Youth Correctional Facility (WGYCF). HYJJC is located in Jackson, MS and operated by Hinds County. HYJJC houses the children under the jurisdiction of the Hinds County Youth Court who are awaiting court appearances or who have been committed to the detention center. HCJDC is located in Biloxi, MS and operated by a private company, Mississippi Security Police, under a contract with Harrison County. HCJDC houses the children under the jurisdiction of the Harrison County Youth Court who are awaiting court appearances or who have been committed to the detention center. OTS is operated by the Mississippi Department of Human Services (DHS) and located in Raymond, MS. OTS houses children who have been committed to DHS pursuant to a delinquency adjudication. WGYCF is a Mississippi Department of Corrections (MDOC) Prison, which is operated by Cornell, Inc. WGYCF houses children in the custody of MDOC who are between the ages of 13-21.

In 2006, DRMS (then Mississippi Protection and Advocacy Systems Inc.) entered into a contract with MYJP to give MYJP the access rights and privileges that DRMS has under federal law with respect to detention centers, correctional facilities and mental health facilities that house individuals under age 21 who live with mental illness, developmental disabilities, and/or other disabilities. 42 U.S.C. § 10804(a)(1)(A)-(B); 42 C.F.R. § 51.42(a). *See* Exhibit 3. This contract was renewed in 2009 under DRMS's new name. Exhibit 2 __. Under these agreements, MYJP may investigate incidents of abuse and/or neglect concerning individuals with mental illness, developmental disabilities, and/or other disabilities under age 21 who are committed to WGYCF, OTS, any county jail or detention center, or facilities run by the state Department of Mental Health, to monitor these facilities for compliance with the P & A Laws, and to have access to individual and facility records.

various forms of mental illness and learning disabilities.[2]  Compl. ¶ 16.  DRMS has received

credible reports of abusive and unlawful conditions at the Juvenile Detention Center from

numerous sources, including from youth who were imprisoned in the Juvenile Detention Center.

Compl. ¶ 8.  The unlawful conditions in the Juvenile Detention Center include dangerous and

unsanitary living quarters, a deliberately cruel and arbitrary use of chemical restraints (also

known as mace, OC or pepper spray), overcrowding, excessive cell confinement, a lack of

educational services, and inadequate mental health treatment. *Id.*  These accounts have been

confirmed by multiple reports issued by the Lauderdale County Grand Jury and by a recent

report from the Mississippi Department of Public Safety's Detention Monitoring Unit. *Id.*

Based on these reports, DRMS has more than probable cause to believe that incidents of abuse

and/or neglect continue to occur at the Juvenile Detention Center. *Id.*  Pursuant to the P & A

Acts, DRMS asserted its access authority to County Officials, and County Officials summarily

denied or ignored each of DRMS's requests. *See* Compl. ¶¶ 24-28; Exhibit 1 (Atwood

Declaration).

For over a year, DRMS exchanged letters and telephone calls with County Officials

regarding P & A access to the Juvenile Detention Center. Compl. ¶ 25. *See also* Compl. Exhibit

---

[2]  In November 2005, the Director of the Lauderdale County Juvenile Detention Center estimated that 60% of the youth held at the facility required mental health services. Angela A. Robertson & R. Gregory Dunaway, *Juvenile Detention Monitoring in Mississippi: Report on Facility Compliance with Section 5 of the Juvenile Justice Reform Act of 2005 (Senate Bill 2894)* (Jan. 2006), http://www.ssrc.msstate.edu/publications/jdmm.pdf.

This estimate is consistent with prevalence rates reported for incarcerated youth in the state as a whole and nationally.  A study funded by the Mississippi Department of Public Safety and the Mississippi Department of Mental Health found that 66% to 85% of incarcerated juveniles in Mississippi suffer from at least one diagnosable mental disorder, compared to only 14% to 20% of youth in the state's general population.  Angela Robertson & Jonelle Husain, Mississippi State University, *Prevalence of Mental Illness & Substance Abuse Disorders Among Incarcerated Juveniles* (July 2001), http://www.ssrc.msstate.edu/publications/Prevalence%20of%20Mental%20Illness.PDF. *See also* Angela A. Robertson, et al., *Prevalence of Mental Illness & Substance Abuse Disorders Among Incarcerated Juveniles*, 35 CHILD PSYCHIATRY & HUM. DEV. 55 (2004), http://www.ssrc.msstate.edu/publications/juvenile/mentillnessprev.pdf.

Nationally, "studies have found that among youth in various types of juvenile justice settings—for example, pretrial detention centers where youth are taken soon after arrest—about one-half to two-thirds meet criteria for one or more mental disorders. The prevalence of mental disorders is much higher in juvenile justice settings than it is among youth in the U.S. general population, which is about 15 to 25 percent." Thomas Grisso, *Adolescent Offenders with Mental Disorders*, 18 THE FUTURE OF CHILDREN 143, 150 (2008), http://futureofchildren.org/futureofchildren/publications/docs/18_02_07.pdf.

1.  On several occasions, DRMS provided County Officials with a detailed research memorandum explaining the legal basis and scope of DRMS's P & A authority. Compl. ¶ 25. *See also* Compl. Exhibits 1-D, 1-G, 1-I, and 1-J.  In its communications with County Officials, DRMS also made multiple offers to verbally explain P & A rights and to provide information about DRMS's P & A activities in facilities similar to the Juvenile Detention Center located elsewhere in the state. Compl. ¶ 25.  Despite these efforts, County Officials refused to allow DRMS to exercises its access authority.    Compl. ¶¶ 26-27.    *See* Compl. Exhibit 1 (Correspondence between DRMS and County Officials); Exhibit 1 (Atwood Declaration).

On October 6, 2009, DRMS agents Bear Atwood and Poonam Juneja arrived at the Lauderdale County Juvenile Detention Center to conduct monitoring and investigation activities as required by the P & A Acts.[3] Compl. ¶ 27.  DRMS provided County Officials with ample notice of the date and time of the intended visit and had rescheduled this visit once at Defendant's request. *Id.*  Upon their arrival at the Juvenile Detention Center, Lauderdale County Deputy Sheriffs Siciliano and Richardson informed Ms. Atwood and Ms. Juneja that they were not allowed on the premises and escorted them away from the facility. *Id.*  *See also* Exhibit 1 (Atwood Declaration).

### III.  Discussion

In order to fulfill its federal mandate, DRMS must have prompt access to residents, facilities and records when it is monitoring a facility or investigating complaints of abuse or neglect  that have occurred or may occur in any facility—including correctional facilities and

---

[3] Federal law permits DRMS to designate agents with whom it contracts to assist in carrying out its responsibilities under federal law.  42 U.S.C. § 10801(b); 42 U.S.C. § 10805(a)(1); 42 C.F.R. § 51.42.  Pursuant to this authority, DRMS has contracted with the Mississippi Youth Justice Project (MYJP) to conduct monitoring activities in juvenile justice and mental health facilities throughout the state of Mississippi. When conducting monitoring under the P & A Acts, MYJP is an agent of DRMS and thus has the same access authority under federal law. *See* Compl. ¶ 5 n.1; Exhibit 2 (Memorandum of Cooperation between MYJP and DRMS).

juvenile detention centers—that houses individuals with disabilities.  *See* 42 C.F.R. §§ 51.2, 51.41, 51.42; 45 C.F.R. §§ 1386.19, 1386.22. *See, e.g., Mississippi Protection & Advocacy v. Cotten*, 1989 U.S. Dist. LEXIS 17075, at *32 (S.D. Miss. 1989), *aff'd*, 929 F.2d 1054 (5th Cir. 1991); *Advocacy Ctr. v. Stalder*, 128 F.Supp.2d 358, 361, 363 (M.D. LA 1991).[4]  Even without probable cause to believe a particular incident of abuse or neglect took place, designated organizations are entitled to reasonable unaccompanied access to facilities and their residents in order to monitor facilities' compliance with respect to the rights and safety of their residents. 42 C.F.R. § 51.42(c); 45 C.F.R. § 1386.22(g).

To allow designated organizations to fulfill the purposes of the P & A Acts, Congress empowered them with certain access rights, including the right of access to facilities that provide care or treatment to people with mental illness and the right to access certain records.  *See* § 10805(a)(3).  As noted *supra* at 2, the designated "P & A system" for Mississippi is DRMS.

Under this authority, DRMS has rights to:

1)    communicate privately with Juvenile Detention Center residents,  42 C.F.R. § 51.42 (d) and  45 C.F.R. § 1386.22(h);

2)    reasonable unaccompanied access, for monitoring and investigatory purposes, to public and private areas of the Juvenile Detention Center, 42 C.F.R. § 51.42(b), (c); 45 C.F.R. § 1386.22(f), (g);

---

[4]   The legislative history of the PADD and PAIMI Acts makes clear that Congress intended that the parallel provisions in the Acts be applied in a consistent manner. *See, e.g.*, S. Rep. 454, 100th Cong., 2d Sess. 10 (1988); S. Rep. 109, 99th Cong., 1st Sess. 3 (1986); S. Rep. 113, 100th Cong., 1st Sess. 24 (1987); *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*, 894 F. Supp. at 428  (stating that the "legislative history suggests that the record access provisions of the [PADD and PAIMI] acts are meant to be consistent"), *aff'd*, 97 F.3d 492 (11th Cir. 1996).  Accordingly, the case law interpreting one P & A program's access provisions is equally applicable with respect to the interpretation of the counterpart provisions in a sister program.  *Advocacy Inc. v. Tarrant County Hospital District*, 2001 WL 1297688 (N.D. Tex. 2001), at *2 n. 4 (Recognizing that because the acts are virtually identical and further the same goal – protecting the rights of vulnerable individuals -- judicial interpretation of provisions in the PADD Act are useful for questions raised under a comparable provision in the PAIMI Act); *Advocacy Center v. Stalder*, 128 F. Supp.2d 358, 360 n. 2 (M.D. La. 1999) (recognizing that case law under the PADD Act is helpful to the court in determining right to access under the PAIMI Act).

3)      access to facility incident reports and investigatory findings (including videos, incident reports, grievances, medical and mental health records, staff logs, personnel records, population logs), to investigate abuse/mistreatment of disabled children,  42 C.F.R. § 51.41(c)(2);

4)      provide information and training on individual rights and services provided by the P & A system,  42 C.F.R. § 51.42 (c) and 45 C.F.R. § 1386.22(g);

5)      interview facility service recipients, staff and other persons as part of an abuse and neglect investigation when there is probable cause to believe an incident of abuse and neglect has occurred,  42 C.F.R. § 51.42(b); and

6)      access records of facility residents.  42 C.F.R. § 51.41 and 45 C.F.R. § 1386.22.

Defendant has refused to allow DRMS to exercise each of these rights, in violation of federal law.  As shown below, DRMS is entitled to an injunction prohibiting future denials of access to the Juvenile Detention Center, its records, residents and staff.

Under Fifth Circuit precedent, preliminary injunctive relief should be granted if DRMS shows (1) a substantial likelihood of success on the merits; (2) irreparable injury; (3) that threatened injury to DRMS outweighs any injury to the Defendant; and (4) that an injunction is not adverse to the public interest. *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006); *Reliant Energy Serv., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 826 n.7 (5th Cir. 2003) (internal quotations and citation omitted).  All four requirements must be met. *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).  As demonstrated below, all four factors favor granting the preliminary injunctive relief sought by DRMS.

**A.** **There is a Substantial Likelihood That DRMS Will Prevail on Its Claim that It is Entitled to Access to the Juvenile Detention Center and to Records.**

Under the P & A Acts, a P & A system, such as DRMS, is entitled to access to facilities that provide care and treatment for persons with disabilities—including juvenile detention centers. 42 U.S.C. 10802(2); 42 U.S.C. § 10805(a)(3); 42 C.F.R. 51.2; 45 C.F.R. § 1386.19; *Michigan Protection and Advocacy Service, Inc. v. Miller*, 849 F. Supp. 1202 (granting motion for summary judgment for P & A on claim for declaratory judgment on right of access to juvenile detention facilities). Congress designated two distinct bases for access to facilities and residents: (1) access for the purpose of investigating allegations of abuse and/or neglect, 42 U.S.C. § 15043(a)(2)(B), 42 U.S.C. § 10805(a)(1)(A), 45 C.F.R. § 1386.22(f), 42 C.F.R. § 52.42(b); and (2) access for the purpose of monitoring the facility and the treatment of its residents, 42 U.S.C. § 15043(a)(2)(H), 42 U.S.C. § 10805(a)(3), 45 C.F.R. § 1386.22(g), 42 C.F.R. § 51.42(c). DRMS asserts its rights to access the Juvenile Detention Center to both investigate allegations of abuse and neglect and to conduct regular monitoring of the facility and its residents.

The federal regulations that accompany the P & A Acts provide guidance regarding the extent of access rights afforded to DRMS. For example, "[a] P & A system shall have reasonable unaccompanied access to public and private facilities and programs in the State which render care or treatment for individuals with mental illness, and to all areas of the facility which are used by residents or are accessible to residents." 42 C.F.R. § 51.42(b). In addition, the regulations further provide that unaccompanied access to facilities shall be allowed "at reasonable times, which at a minimum shall include normal working hours and visiting hours," 42 U.S.C. § 51.42(c), and that this "unaccompanied access to residents of a facility shall include

the opportunity to meet and communicate privately with such individuals regularly, both formally and informally, by telephone, mail and in person," 42 C.F.R. 1386.22 (g)-(h).

Despite the authority plainly conferred upon DRMS, the Defendant and its agents have repeatedly prohibited DRMS from exercising its access rights. Compl. ¶¶ 24-27. Moreover, Defendant further violated federal regulations by failing to provide a written explanation for the denial. 42 C.F.R. § 51.43. However, from various communications between DRMS and county officials, the denial appears to be based on a serious misunderstanding of the applicable laws, a failure to read the applicable laws, or a willful disregard of the applicable laws.

In a conversation on October 5, 2009, a Lauderdale County official suggested that DRMS could not monitor the Juvenile Detention Center because county officials believed it would be a violation of the Mississippi Rules of Professional Conduct for DRMS to meet with eligible youth who are simultaneously represented by a court-appointed public defender in their individual youth court matters. Compl. ¶ 26. However, Mississippi Rule of Professional Conduct 4.2 is not a bar and clearly allows DRMS to communicate with children who are represented in their youth court case. Rule 4.2 states that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer *in the matter*, unless the lawyer has the consent of the other lawyer or *is authorized by law to do so.*" M.R.P.C. 4.2 (emphasis added). The children held at the Juvenile Detention Center have court-appointed attorneys who defend them in their youth court charges, quasi-criminal matters that are distinct from issues that may arise out of the conditions of their confinement. Youth can be simultaneously represented by different attorneys in these distinct cases, without a violation of Rule 4.2. Further, Rule 4.2 carves out an exception to the general rule and clearly allows attorneys to meet with represented youth where they are authorized by

statute to do so. As explained above, federal law explicitly authorizes DRMS to meet with the residents of the Juvenile Detention Center. The Mississippi Rules of Professional Conduct create no bar to DRMS's access rights.

Under the plain language of the P & A Acts as applied to the indisputable facts, the Defendant wrongfully denied DRMS access to the Juvenile Detention Center. Thus, there is a substantial likelihood that DRMS will prevail on its claim.

Under the P & A Acts, a P & A system has authority to "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 10805(a)(1)(A). [5] Moreover, Congress has specifically granted DRMS authority to access records of a child with a disability if DRMS has determined that it has probable cause to believe that such an individual has been subject to abuse and neglect. 42 U.S.C. § 10805(a)(4)(B)). *Stalder* at 366. In this case, DRMS determined in September 2009 that it had probable cause to believe that youth had been subject to abuse and neglect while in the care and custody of the Juvenile Detention Center. Compl. ¶ 8. DRMS is the final arbiter of probable cause—which is defined as reasonable grounds to believe that individuals with disabilities have been or may be at significant risk of being subject to abuse and neglect. 42 C.F.R. § 51.2; *Advocacy Inc. v. Tarrant County Hosp. Dist.*, 2001 U.S. Dist. Lexis 16676, at * 9 (N.D. Tex. 1991).

DRMS has received numerous credible reports from a variety of sources documenting the serious and potentially life-threatening abuse and neglect inflicted upon children detained in the Juvenile Detention Center. Compl. ¶ 8. The unlawful conditions in the Juvenile Detention Center

---

[5] Significantly, the "P & A is the final arbiter of probable cause for the purpose of triggering its authority to access all records for an individual that has been or may be subject to abuse or neglect." *Allen*, 197 F.R.D. at 693. As noted by the Court in *Allen*, "[t]o conclude otherwise would frustrate the purpose of the P & A laws to establish an effective system to protect and advocate for the rights of individuals with disabilities." *Id.* A denial of access to records will prevent the P & A from fulfilling its congressional mandate to investigate incidents of abuse and neglect when it makes a determination of probable cause. *Id.*

include deliberately cruel and unjustified use of mace, unsanitary, dangerous and overcrowded living conditions, inadequate medical and mental health care, a lack of educational services, and 23-hour a day cell confinement. *Id.* These accounts have come from youth who have been imprisoned in the Juvenile Detention Center but who have now been released, the Lauderdale County Grand Jury and the Mississippi Department of Public Safety's Detention Monitoring Unit. *Id.* DRMS clearly has probable cause to suspect that youth with disabilities detained in the Juvenile Detention Center are at a significant risk of being subject to dangerous abuse and neglect.

Several federal cases affirm the Defendants' obligation to provide DRMS with records under these circumstances. In *Stalder*, the plaintiff P & A moved for summary judgment claiming that the PAIMI Act authorized it to access the records of prisoners with mental illness and that neither the department policy of the defendants nor state law could restrict its authority to access these records. 128 F. Supp.2d 358 (M.D. La. 1999). In granting their motion, the court held that the defendants' failure to grant plaintiff access to the records of prisoners at the correctional facility violated plaintiff's rights under 42 U.S.C. § 10805(a) and 42 U.S.C. § 1983. *Id.* at 368. The court also stated that the PAIMI Act preempts state policy, and that the state statute barring release of prisoner records until they were reviewed by a state court was a violation of federal law. *Id.* at 366.

Similarly, in *Tarrant County*, a state hospital asserted that the Texas P & A did not have probable cause to request the records of a deceased resident and that state and federal law prevented the disclosure of confidential records. The court found neither argument persuasive. As to probable cause, the court found that the Texas P & A was the final arbiter of probable cause and that "the facility may not refuse access to records merely because it disagrees with the

existence of probable cause." *Tarrant County* at *9. The court further found that allowing P & A access is "not an accusation or indictment of [the facility], but merely allows P &A to comply with a congressional mandate." *Id.* at *12. The court emphasized the importance of access to records to allow the protection and advocacy system to evaluate its clients' concerns, determine whether a client has a legal claim, and communicate with the clients. "When a facility...denies or places restrictions on an advocacy agency's access to records, the mandatory provisions relating to authority to investigate incidents of abuse and neglect are rendered nugatory. This not only hampers redress of past and current abuse and neglect, but has a detrimental effect on the advocacy agency's future performance of its statutory mandate." *Id.* at * 12 (citing *Cotten*, 929 F.2d at 1056).

Like the defendants in *Stalder* and *Tarrant County*, the Defendant in this case has violated federal law by denying access to residents and their records. The great weight of precedent amply supports Plaintiff's rights to immediate access to the Juvenile Detention Center. By contrast, there is no case law to support the County's denial of access to the Plaintiff.

**B.     Plaintiff DRMS is Suffering Irreparable Injury.**

In this case, Defendant's denial of access to the Juvenile Detention Center and its residents and records is preventing DRMS from fulfilling its charge to monitor conditions and protect the rights of people with mental illness and other disabilities. Interference with a P & A's access rights constitutes *per se* irreparable harm. *Ohio Legal Rts. Serv. v. Buckeye Ranch, Inc.,* 365 F.Supp.2d 877, 883 (S.D. Ohio 2005) ("A protection and advocacy agency's inability to meet its federal statutory mandate to protect and advocate the rights of disabled people constitutes irreparable harm.") See also *Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.,* 355 F.Supp.2d 649, 653 (D. Conn. 2005) (same); *Iowa Prot.*

& *Advocacy Serv., Inc. v. Gerard Treatment Programs*, 152 F.Supp.2d. 1150, 1173 (N.D. Iowa 2001) (concluding that the P & A was "irreparably harmed by being prevented from pursuing fully its right to access records and patients . . . in pursuit of its duty to investigate circumstances providing probable cause to believe abuse or neglect has occurred"); *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F.Supp.2d 1039, 1051 (E.D. Wis. 2001) (finding that "the defendant's refusal to provide [the P & A] with records that it is entitled to review (indeed, charged to review as part of its responsibilities) does, in a very real and readily identifiable way, pose a threat to the [P & A's] being able to discharge its obligations and no amount of damages will remedy that substantial harm").

In *Gerard Treatment Programs*, a treatment facility for children denied the Iowa P & A access to records regarding the use of restraints. The P & A requested, among other relief, a preliminary injunction enjoining the institution from denying full and immediate access to the records pursuant to the P & A Acts. 152 F.Supp.2d at 1173. The court found that the P & A was "irreparably harmed by being prevented from pursuing fully its right to access records and patients." *Id.* As a result, the court granted a preliminary injunction providing for immediate access to the records in question and to the facility. *Id.* at 80-84. Like the P & A in *Gerard*, DRMS is irreparably harmed by Defendant's actions preventing DRMS from exercising its federal right to access the Juvenile Detention Center and its records and detained youth.

Finally, given the grossly unlawful conditions reported at the Juvenile Detention Center and DRMS's obligation to protect detained children from abuse and neglect, DRMS, through the children it is mandated to serve, is irreparably harmed each day the allegations of abuse are not investigated and monitoring activities are prohibited. If DRMS's access is continually denied, children will likely continue to suffer abuse and neglect in the Juvenile Detention Center— living

in unsanitary conditions, denied access to medical, mental health and educational services and being victimized by violent physical abuse. Children forced to endure these unlawful conditions may suffer the consequences of this abuse and neglect for a lifetime.

### C. The Threatened Injury to DRMS Outweighs Any Damages a Preliminary Injunction May Cause the Defendant.

In contrast to the irreparable injury to DRMS, Defendant will not suffer any harm if an injunction is granted. The Eleventh Circuit succinctly analyzed this issue in *Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Ctr.*:

> The facility's interests surely are less viable and of less import than those of the individual and the P & A. The facility can claim no interest in avoiding investigations of harm or injury to a person with a disability. Minor inconveniences to staff or some disruption of the facility's routine hardly rise to the level of the liberty interest that is generally at issue in a criminal investigation. *Michigan Protection & Advocacy Service, Inc. v. Miller*, 849 F. Supp. 1202, 1208-09 (W.D. Mich. 1994) (defendant's objections that the P & A access to facility for [sic] will interfere with programming have no merit). *Indeed, one would suppose that a facility's legitimate interests are served when abuse and neglect are uncovered and can be corrected.*

97 F.3d 492, 499 (11th Cir. 1996) (emphasis added). As in *Tarwater*, Lauderdale County's legitimate interests will be served by DRMS's monitoring and investigative activities.

DRMS's mandate of protection and advocacy is entirely consistent with the Defendant's obligation to "establish and maintain detention facilities, shelter facilities...or any other facility necessary to carry on the work of the youth court." Miss. Code Ann. § 43-21-109. The Youth Court's purpose is to ensure that youth under its jurisdiction become "responsible, accountable and productive citizen[s], and that each such child shall receive such care, guidance and control, preferably in such child's own home as is conducive toward that end and is in the state's and the child's best interest." Miss. Code Ann. § 43-21-103. DRMS's statutory authority to monitor conditions at the Juvenile Detention Center and to investigate possible incidents of abuse or

neglect only furthers these shared interests. The Defendant certainly will not be harmed by the requested relief.

### D. Granting a Preliminary Injunction Does No Disservice to the Public Interest.

Because the defendants in this case are "public servants charged with the enforcement of the law," it is appropriate to "consider together the balancing of the equities required by test three and the question of whether the injunction would disserve the public interest, which is test four." *Spiegel v. City of Houston*, 636 F.2d 997, 1002 (5th Cir. 1981); *accord Thomas v. Johnston*, 557 F. Supp. 879, 918 (W.D. Tex. 1983). There is no question that both tests are met in this case. As explained above, the relief requested by the Plaintiff—the ability to enforce its access rights pursuant to the P & A Acts—would impose little or no burden on the Defendants.

An injunction that requires compliance with federal statutes serves the public interest by enforcing public policy as expressed in the statutes. *See Nobby Lobby. Inc. v. City of Dallas*, 767 F.Supp. 801, 821 (N.D.Tex. 1991), *aff'd*, 970 F.2d 82 (5th Cir. 1992) ("The public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve."). *See also Patriot, Inc. v. U.S. Dept. of Housing & Urban Dev.*, 963 F.Supp. 1, 11 (D.D.C. 1997) (recognizing that the public interest is served by an injunction that requires compliance with federal law). A preliminary injunction in this case will merely transform the applicable requirements of the P & A Acts into a court order, which will have the effect of enforcing public policy as expressed in the federal statutes. Thus, granting a preliminary injunction in this case will further the public interest, not disserve it.

Further, the public interest is clearly served by ensuring that children under the mandate of care by the Defendant are not subject to unlawful abuse and neglect. It is hard to imagine a more

compelling public interest than the protection of vulnerable, disabled children who may be the victims of life-threatening violence and neglect.

**E.    The Requirement That a Bond Be Posted Should Be Waived**

The Plaintiff respectfully requests that the Court exercise its discretion to waive the bond requirement customarily associated with the issuance of preliminary injunctive relief. *See* Fed. R. Civ. P. 65(c). Several courts have declined to require plaintiffs to post bond in connection with temporary restraining orders and preliminary injunctions. *See Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (approving waiver of bond given strength of case and "the strong public interest involved"); *Bookfriends, Inc. v. Talt*, 223 F.Supp.2d 932, 953 (S.D. Ohio 2002) (declining to require bond based on finding that defendants would suffer no monetary damage in the event they were wrongfully enjoined); *Sluiter v. Blue Cross & Blue Shield*, 979 F.Supp. 1131, 1145 (E.D. Mich. 1997) ("Due to the strong likelihood of Plaintiffs' success on the merits and their demonstrated financial inability, the Court finds it would be improper to require any security in this matter."). In this case, several factors counsel in favor of waiver, including the strength of the claims, the strong public interest involved, and the fact that a preliminary injunction would not require the County to incur any financial burdens.

**IV.  Conclusion**

For all of the foregoing reasons, DRMS respectfully requests that the Court enter a preliminary injunction enjoining Defendant Lauderdale County from denying Plaintiff any and all future access to facilities, records, employees, and residents as required by the P & A Acts and its implementing regulations.

This 19th day of October, 2009.

Respectfully submitted,

Poonam Juneja, Miss. Bar No. 103181
Vanessa Carroll, Miss. Bar No. 102736
Sheila A. Bedi, Miss. Bar No. 101652
Mississippi Youth Justice Project
A Project of the Southern Poverty Law Center
921 N. President St., Suite B
Jackson, Mississippi 39202
601-948-8882 (phone)
601-948-8885 (fax)


Robert B. McDuff, Miss. Bar. No. 2532
767 North Congress Street
Jackson, Mississippi 39202
601-969-0802 (phone)
601-969-0804 (fax)


Kimalon Melton, Miss. Bar No. 99466
Disability Rights Mississippi
5305 Executive Place
Jackson, Mississippi 39206
601-981-8207 (voice)
601-981-8313 (fax)

Counsel for Plaintiff

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| DISABILITY RIGHTS MISSISSIPPI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 4:09CV37TSL-LRA |
| v. | ) | |
| | ) | |
| LAUDERDALE COUNTY, MISSISSIPPI, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF BEAR H. ATWOOD

I, Bear H. Atwood, state that the following is true and correct to the best of my knowledge:

1.      Between October 2007 and October 2009, I was the Director of the Mississippi Youth Justice Project ("MYJP"), a project of the Southern Poverty Law Center.  Pursuant to 42 U.S.C. § 10804(a)(1)(A-B) and 42 C.F.R. § 51.42(a), MYJP has a contract with Disability Rights Mississippi ("DRMS") (formerly known as Mississippi Protection and Advocacy Services, Inc.), the designated Protection and Advocacy ("P & A") system in Mississippi with a federal mandate to investigate incidents of abuse and neglect against individuals with disabilities or mental illnesses and to monitor the conditions of facilities where these individuals may be held; this contract authorizes MYJP to engage in P & A activities at facilities throughout the state of Mississippi in which youth accused or adjudicated of delinquency were detained or incarcerated.  While I was at MYJP, I, along with other attorneys and staff members under my supervision,

monitored conditions at a number of facilities in Mississippi as agents of DRMS. These facilities included the Henley-Young Juvenile Detention Center in Jackson, Mississippi, the Harrison County Juvenile Detention Center in Biloxi, Mississippi, the Oakley Training School in Raymond, Mississippi, the Columbia Training School in Columbia, Mississippi, and the Walnut Grove Correctional Facility in Walnut Grove, Mississippi.

2.      On December 8, 2008, I sent a letter to Lauderdale County officials, regarding a P & A monitoring visit at the Lauderdale County Juvenile Detention Center. *See* Compl. Exhibit 1-H. Before I wrote this letter, Vanessa Carroll, an attorney who worked under my supervision at MYJP, informed me that she had contacted several Lauderdale County officials through letters and telephone calls, but that they had not allowed her to visit the Juvenile Detention Center. *See* Compl. Exhibits 1-I, 1-J, and 1-K. I did not receive a response to my letter.

3.      In September of 2009, I renewed my efforts to gain access to the Lauderdale County Juvenile Detention Center after hearing of reports about unlawful conditions within the facility from the state's Detention Monitoring Unit and formerly detained youth. Between September 24, 2009 and October 8, 2009, I sent five letters to Lauderdale County officials to make arrangements for a P & A visit at the Juvenile Detention Center. *See* Compl. Exhibits 1-A, 1-B, 1-D, 1-F, and 1-G. During this time period, I also had numerous telephone conversations with Lauderdale County officials about this P & A visit.

4.      On October 6, 2009, I went to the Juvenile Detention Center with MYJP attorney Poonam Juneja to conduct a visit of the facility. I had provided Lauderdale County with notice of the date and time of the intended visit a week beforehand, both in

letters and in telephone conversations, and had rescheduled this visit once at the request of the County's attorney. *See* Compl. Exhibits 1-B, 1-D, 1-E, and 1-F. When we entered the door to the Lauderdale County Juvenile Center, which houses both the detention center and the Youth Court, Deputy Sheriff Andy Siciliano, who was seated next to the entryway, asked us to identify ourselves. When we complied, Deputy Sheriff Sicialiano asked us to step outside of the Juvenile Center. Once outside, Deputy Sheriff Siciliano, accompanied by Deputy Sheriff Richardson, informed us that he had been instructed by his superiors to tell us that we were not permitted on the premises and would have to leave. Upon our inquiry, Deputy Sheriff Siciliano clarified that we were not allowed on the entire premises, not just those of the detention center

I declare under penalty of perjury that the foregoing is true and correct.

Date: October 18, 2009.

s/Bear H. Atwood, Miss. Bar. No. 103234
Mississippi Youth Justice Project
A Project of the Southern Poverty Law Center
921 N. President St, Suite B
Jackson, Mississippi 39202
601-948-8882 (telephone)
601-948-8885 (fax)

# EXHIBIT 2

# COOPERATIVE AGREEMENT

This is a contract between Disability Rights Mississippi (DRMS) formerly known as Mississippi Protection and Advocacy Systems, Inc., and the Mississippi Youth Justice Project, a project of the Southern Poverty Law Center (MYJP). This contract is intended to provide MYJP with access to detention centers, correctional and mental facilities in Mississippi housing individuals with mental illness, developmental disabilities, and/or other disabilities under the age of 21. Pursuant to federal law and this agreement, MYJP will have all of the access rights and privileges afforded to DRMS, subject only to the limitations explained below.

1. Pursuant to 42 U.S.C. §10804(a)(1)(A-B), DRMS has the authority to contract with non-profit organizations that: 1) operate throughout the state of Mississippi; 2) are independent of any agency that provides treatment or services to individuals with disabilities; and 3) have the capacity to protect and advocate for the rights of individuals with disabilities. MYJP operates throughout the state of Mississippi, does not provide treatment services to individuals with disabilities, has demonstrated experience in working with individuals with mental illness, and has the capacity to protect and advocate for the rights of all individuals with disabilities.

2. Pursuant to the above and 42 C.F.R. §51.21(3)(i), MYJP is authorized to provide the following protection and advocacy services: to investigate incidents of abuse and neglect concerning individuals with mental illness, developmental disabilities, and/or other disabilities who are incarcerated at the Walnut Grove Youth Correctional Facility, any county jail, detention center or juvenile detention center housing children under the age of 21 and the Oakley Training School; to investigate incidents of abuse and neglect concerning individuals with mental illness, developmental disabilities, and/or other disabilities under the age of 21 committed to any facility operated by the Department of Mental Health, including, but not limited to the Juvenile Rehabilitation Facility and the Specialized Treatment Facility for Youth with Emotional Disturbances; and to monitor the above mentioned facilities for compliance with respect to the rights and safety of service recipients as outlined in 45 C.F.R. §1386.22(g) and 42 C.F.R. §51.42(c)(2).

3. Pursuant to 42 U.S.C. §10806, this contract authorizes MYJP to have access to all records of any person with a disability who resides in any facility in which MYJP conducts monitoring visits, as well as all facility records to which DRMS is authorized access.

4. MYJP is authorized to pursue administrative, legal and other appropriate remedies to ensure the protection of individuals with mental illness, developmental disabilities, and/or other disabilities in the above-mentioned facilities. MYJP will provide notice to DRMS before it initiates any formal legal action.

5. MYJP will establish a schedule of monitoring visits and will provide DRMS with a written report of each visit within one week of the visit.

6. Pursuant to 42 C.F.R. §51.21, MYJP affirms that: MYJP attorneys, community advocates, and interns routinely advocate for children with mental illness, developmental disabilities, and/or disabilities and their families and conduct investigations on their behalf. 42 C.F.R. §51.21(b)(3)(ii). In the course of monitoring and/or investigation, MYJP will conduct interviews with clients and facility staff and review the relevant records. 42 C.F.R. §51.21(b)(3)(iii). While there is no deadline for this contract, it may be cancelled by either party upon written notification of cancellation provided two weeks in advance. 42 C.F.R. §51.21(b)(3)(iv). MYJP will use its own resources to fulfill the contract and will not seek monetary support from DRMS. 42 C.F.R. §51.21(b)(3)(v).

7. MYJP will abide by the federal law that establishes DRMS and will meet all applicable terms and conditions of DRMS's grant of authority. 42 C.F.R. §51.21(vi). All work conducted pursuant to this contract will be executed under the supervision of the Director of MYJP who is an attorney. MYJP affirms that it carries liability insurance for all its employees and that MYJP's liability insurance will cover all MYJP work conducted pursuant to this contract. 42 C.F.R. §51.21(vii). MYJP attorneys, community advocates, and interns are trained to provide advocacy services to and to conduct full investigations on behalf of individuals with mental illness and other disabilities. MYJP attorneys, community advocates, and interns are trained to work with family members of clients served by DRMS where the clients are minors and legally competent and choose to involve the family member, or are legally incompetent and the legal guardians, conservators or other legal representatives are family members. 42 C.F.R. §51.21(viii)-(ix).


_____          6/18/09
                                         _____
Bear Atwood, Director                    Date

Mississippi Youth Justice Project

_____          6/24/09
                                         _____
Ann Maclaine, Interim Executive Director Date

Disability Rights Mississippi


2

# EXHIBIT 3

## Cooperative Agreement Between Mississippi Protection & Advocacy System, Inc. and the Mississippi Youth Justice Project, a project of the Southern Poverty Law Center

This is a contract between Mississippi Protection and Advocacy, "MS P&A," and the Mississippi Youth Justice Project, a project of the Southern Poverty Law Center "MYJP." This contract is intended to provide MYJP with access to correctional and mental health facilities housing mentally ill individuals under the age of 21. Pursuant to federal law and this agreement, MYJP will have all of the access rights and privileges afforded to MS P & A, subject only to the limitations explained below.

1. Pursuant to 42 U.S.C. § 10804 (a) (1)(A-B), MS P & A has the authority to contract with non-profit organizations that 1) operate throughout the state of Mississippi; 2) are independent of any agency that provides treatment or services to individuals with disabilities; and 3) have the capacity to protect and advocate for the rights of individuals with disabilities. MYJP operates throughout the state of Mississippi, does not provide treatment services to individuals with disabilities, and has the capacity to protect and advocate for the rights of individuals with disabilities.

2. This contract authorizes MYJP to investigate incidents of abuse and neglect concerning individuals with mental illness, developmental disabilities, and/or other disabilities who are incarcerated at the Walnut Grove Youth Correctional Facility, any county jail detention center or juvenile detention center housing children under the age 21, the Oakley Training School, and the Columbia Training School. This contract further authorizes MYJP to investigate incidents of abuse and neglect concerning individuals with mental illness, developmental disabilities, and/or other disabilities under the age of 21 committed to any facility operated by the Department of Mental Health including, but not limited to the Juvenile Rehabilitation Facility and the Specialized Treatment Facility for Youth with Emotional Disturbances.

3. Pursuant to 42 U.S.C. § 10806, this contract authorizes MYJP to have access to all records of any person with a disability who is incarcerated or committed in any institution in which MYJP conducts monitoring visits.

4. MYJP is authorized to pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness, developmental disabilities, and/or other disabilities in the above-mentioned facilities. MYJP will provide notice to MS P & A before it initiates any formal legal action.

5. MYJP will establish a schedule of monitoring visits and will provide notice to MS P & A at least twenty-four hours in advance of every visit. MYJP will also provide MS P & A with a written report of each visit within 48 hours of the visit.

6. All work conducted pursuant to this contract will be executed under the supervision of Sheila Bedi, an attorney and co-director of the MYJP. MYJP's liability insurance will cover all MYJP work conducted pursuant to this contract.

Sheila A. Bedi
Co-Director, MYJP

11/16/06
Date

Rebecca A. Floyd
Executive Director, MPAS

11/14/06
Date

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| D.W., by and through his next friend, Devonsha Fairley; K.V., by and through her next friend Sina Matheny; A.R., by and through her next friend Laura Reed; J.P., by and through his next friend Theresa Pope; A.B., by and through her next friend Bernadette Brossett; W.R. by and through his next friend, Calista Blackmon; on behalf of themselves and all persons similarly situated; MISSISSIPPI PROTECTION AND ADVOCACY SYSTEM, INC., ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) | Case No. 1:09 cv 267 LG-RHN |
| ) | |
| HARRISON COUNTY, MISSISSIPPI, ) | |
| ) | |
| Defendant. ) | |

**AGREED ORDER**

On April 20, 2009, Plaintiff Mississippi Protection and Advocacy (MPAS) filed this litigation against Harrison County seeking to enforce what it contends are its access rights to the Harrison County Juvenile Detention Center pursuant to the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. §§10801 et. seq.; the Developmental Disability Assistance and Bill of Rights Act of 2000 ("DD Act"), 42 U.S.C. §§15001, et. seq.; Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C. §§794e, et. seq.

. After negotiation among the parties, the Defendant and the plaintiffs have agreed that the Court may order a tentative plan of access until the parties can further investigate this case, and attempt to negotiate a permanent resolution or obtain a ruling from the Court on any disputed

issues, including any jurisdictional issues and any other defenses, which are preserved by the Defendant.

Accordingly, with the agreement of the parties and pending further order of the Court, it is hereby ordered that Harrison County shall:

1.    Allow MPAS and/or its contractor (the Mississippi Youth Justice Project) to conduct confidential visits with any resident who requests a confidential visit, to determine whether that resident is eligible for MPAS services.   MPAS will provide residents with instructions about how to request a confidential visit by announcing its presence in the facility during its monitoring visits.

2.    Allow MPAS and/or its contractor to conduct confidential visits with any eligible resident who requests to speak with MPAS.    MPAS will provide residents with instructions about how to request a confidential visit by announcing its presence in the facility during its monitoring visits.

3.    Allow MPAS and/or its contractor to conduct confidential visits with any resident or who alleges that he or she may have knowledge of alleged abuse or neglect of any resident eligible for MPAS services.

4.    Allow MPAS to establish a daily call in time between the hours of 4:00 p.m. and 9:00 p.m. daily.   During this time residents shall have the opportunity to communicate confidentially with MPAS. The County shall insure that residents are informed of the call in time, and provide them with confidential access to the telephone. Allow any resident to contact MPAS and/or its contractor through confidential letters, and allow MPAS to prepare and post notices throughout the juvenile detention center, in the visitation room, and in the resident's living quarters, that inform residents of their rights to contact MPAS.

5.    Allow access to all relevant records (including videos, incident reports, grievances, staff logs, personnel records excluding staff protected health information under HIPAA, population logs, recordings) upon the written request of MPAS when the MPAS believes there is probable cause to investigate a potential incident of abuse or neglect of eligible residents.  MPAS agrees to obtain a valid release from the facility resident and his/her guardian before requesting that individual resident's medical, mental health, educational, or youth court records.  The release MPAS obtains will include a provision that releases and holds harmless the County and the County's contractor for the release of the resident's records.   However, releases shall not be required when MPAS requests facility records such as those enumerated in the first sentence of this paragraph, despite the fact that they may contain otherwise confidential information related to individual facility residents

6.    Allow any resident to meet confidentially with any attorney or a member of the attorney's staff, who has a retainer agreement from the resident, or the resident's parent or guardian, authorizing the attorney to represent the resident regarding any legal matter, including, but not limited, to youth court matters or condition of confinement.

7.    Allow MPAS and/or its contractor reasonable access to view and photograph all areas of the detention center that are used by residents or that might be accessible to them, however no photographs of any residents will be allowed unless MPAS obtains a valid release from the resident or the resident's guardian.

8.    MPAS and its contractors will provide the Defendant and its contractor two (2) hours notice for confidential visits and tours.   Record reviews will only occur during the facility's regular business hours.

SO ORDERED, this _11th_ day of _June_____, 2009.

_____
UNITED STATES DISTRICT JUDGE

AGREED:

_____
Sheila A. Bedi
Vanessa Carroll
Counsel for Plaintiffs

_____
Kay Hardage
Counsel for Mississippi Protection and Advocacy

_____
Joseph Meadows
Counsel for Defendant